**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | No. CR-08-0672 PCT DGC |
| Plaintiff, | ) | **ORDER** |
| vs. | ) | |
| Cedric Edmund Salabye, | ) | |
| Defendant. | ) | |

Defendant Cedric Salabye is charged with selling parts of bald and golden eagles in violation of 16 U.S.C. § 668(a). Salabye has filed a motion to suppress statements made to law enforcement officers on August 18, 2006. Dkt. #19. The Government has filed a response and Defendant has filed a reply. Dkt. ##27, 28. The Court held an evidentiary hearing on April 14, 2009. For the following reasons, the Court will grant the motion.

**I.     Factual Findings.**

The following facts are taken from the testimony and exhibits received into evidence at the hearing on April 14, 2009. Special Agent Preston Fant of the United States Fish and Wildlife Service ("FWS") testified, as did Defendant Salabye.

At 2:44 p.m. on August 18, 2006, Agent Fant and other law enforcement officers arrived at Defendant's home in Dilkon, Arizona, on the Navajo Indian reservation. Agent Fant had obtained a warrant to search Defendant's home. Agent Fant was accompanied by two FWS agents and two officers with the Navajo Nation Department of Fish and Wildlife Conservation.

1    Agent Fant and the other two FWS agents were wearing bulletproof vests underneath
2 jackets bearing the words "Police" and "Federal Agent." The agents wore ball caps with law
3 enforcement insignias and utility belts with guns, handcuffs, and badges. The Navajo
4 officers were dressed in Navajo Nation uniforms and were armed. The FWS agents arrived
5 at Salabye's house in unmarked pickup trucks. The Navajo officers arrived in marked patrol
6 cars. Agent Fant testified that the three FWS agents were there to execute the search
7 warrant. The Navajo officers were to provide security at the residence and prohibit persons
8 from entering the house during the search.
9    Defendant and his common law wife, Adrienne Begay, answered the door. Agent
10 Fant announced his purpose and identity and requested that Defendant step outside. Agent
11 Fant provided Defendant with a copy of the search warrant. After Defendant had read the
12 warrant, Agent Fant told Defendant that he was free to leave, but stated that he had some
13 questions for Defendant and it would be helpful if Defendant would answer them. Agent
14 Fant suggested that he and Defendant talk in Agent Fant's truck, which was parked in front
15 of Defendant's residence. Defendant agreed, and he and Agent Fant entered the pickup
16 truck. The other two FWS officers then began searching Defendant's house while the
17 Navajo officers provided security outside the residence.
18    Once in the truck, Agent Fant again told Defendant he was free to leave, but stated
19 that he was going to have questions for Defendant and it would be helpful if Defendant
20 stayed. Defendant agreed. Agent Fant did not advise Defendant of his right to remain silent,
21 his right to counsel, or otherwise provide him with *Miranda* warnings. Agent Fant
22 proceeded to question Defendant in the truck for two hours and seven minutes. Agent Fant
23 recorded one hour and 34 minutes of the conversation, but did not tell Defendant of the
24 recording. A CD containing the recording was admitted in evidence during the hearing and
25 has been reviewed by the Court. The doors of the truck were shut with the windows down.
26 Agent Fant testified that questioned Defendant in the truck because it was a quiet
27 environment. During the questioning, one of the uniformed Navajo officers was visible at
28 the front of the residence.

1   About 30 minutes into the conversation, Agent Fant asked if Ms. Begay knew the source of $600 that Defendant allegedly received that day for the sale of eagle fathers. Although the recording is not entirely clear, Defendant Salabye appears to say in response to this question that he feels uncomfortable. Agent Fant then states that he thinks Defendant is "doing the right thing" by volunteering to stay and talk things over "for a minute." Agent Fant then says "we shoudn't be here too long."

   At one point during the questioning in the truck, Defendant's mother and another woman arrived at the house in another truck. Agent Fant left his truck, identified himself, told the women to turn off the engine of their truck, and asked them to identify themselves. The women initially responded that they were on their way to an appointment. Agent Fant replied that they would not have come to the house if they had an appointment. After a brief conversation, the women were permitted to leave, but Agent Fant instructed them not to return to the house until the law enforcement officers had completed their work.

   During the questioning, another male drove past Defendant's residence. Agent Fant testified that Defendant directed the male to leave the residence or directed law enforcement officers to tell him to leave.

   After approximately one hour of questioning, Ms. Begay walked by the truck carrying a purse. Agent Fant told Ms. Begay that he needed to look in her purse. He examined a cell phone and address book from the purse and asked Defendant and Ms. Begay – who was standing at the passenger side window of the truck – about the names in the cell phone and address book. The joint questioning of Defendant and Ms. Begay lasted approximately 25 minutes.

   Agent Fant's questioning was calm and courteous. He did not threaten Defendant, nor did he tell Defendant that he was under arrest. No guns were drawn during the questioning or the search. Agent Fant had compiled a substantial amount of evidence before arriving at the house, and he questioned Defendant about some of the evidence.

   After more than two hours of questioning in the truck, Agent Fant directed Defendant to enter the house to see if there were other questions to be answered. An additional 30

1  minutes of questioning then occurred in the house, with Defendant and Ms. Begay sitting in
2  an open area near the kitchen. Agent Fant stated during this conversation that Defendant
3  Salabye is known for selling eagle feathers and that Agent Fant finds some of Defendant's
4  answers difficult to believe. At one point the phone rang, and Agent Fant directed Defendant
5  not to answer it.

6  The questioning of Defendant in the truck and the house lasted a total of two hours
7  and 37 minutes. Agent Fant was with Defendant the entire time. The five law enforcement
8  officers left the residence at 6:07 p.m.

9  Defendant Salabye has a twelfth grade education and lives in a rural part of the
10 Navajo reservation. He testified that he was frightened by the armed agents and officers.
11 He testified that Agent Fant directed him to get in the truck rather than asking him. He
12 testified that given the agents' guns, vests, and badges, he did not feel free to leave despite
13 Agent Fant's statements. He also testified that he was not comfortable leaving because he
14 was at home where he, his wife, and his three children live.

15 **II.     Discussion.**

16 In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit
17 addressed a question of first impression in this Circuit: "Under what circumstances under
18 the Fifth Amendment does an interrogation by law enforcement officers in the suspect's own
19 home turn the home into such a police-dominated atmosphere that the interrogation becomes
20 custodial in nature and requires *Miranda* warnings?" *Id.* at 1077. The Court of Appeals
21 noted that a suspect is considered "in custody" for purposes of *Miranda* "if the suspect has
22 been 'deprived of his freedom of action in any significant way.'" *Id.* at 1082 (quoting
23 *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "To determine whether the suspect was in
24 custody, we first examine the totality of the circumstances surrounding the interrogation.
25 We then ask whether a reasonable person in those circumstances would have felt he or she
26 was not at liberty to terminate the interrogation and leave." *Id.* at 1082 (citations and
27 quotations omitted).

28

1    To distinguish custodial from non-custodial interrogations, *Craighead* considered "the
2 extent to which the circumstances of the interrogation turned the otherwise comfortable and
3 familiar surroundings of a home into a 'police-dominated atmosphere.'" *Id.* at 1083.
4 *Craighead* identified several relevant factors: "(1) the number of law enforcement personnel
5 and whether they were armed; (2) whether the suspect was at any point restrained, either by
6 physical force or by threats; (3) whether the suspect was isolated from others; and (4)
7 whether the suspect was informed that he was free to leave or terminate the interview, and
8 the context in which any such statements were made." *Id.* at 1085. This list is not
9 exhaustive. *Id.* In other custodial interrogation cases, the Ninth Circuit identified several
10 additional factors: "'(1) the language used to summon the individual; (2) the extent to which
11 the defendant is confronted with evidence of guilt; (3) the physical surroundings of the
12 interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to
13 detain the individual.'" *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (quoting
14 *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).

15    Considering the totality of the circumstances, the Court concludes that a reasonable
16 person in Defendant Salabye's position would not have felt free to leave or terminate the
17 questioning. Salabye should have been given *Miranda* warnings.

18    First, Defendant was confronted by five uniformed officers, all of whom were armed.
19 The officers remained at Defendant's residence throughout the search and interrogation. The
20 Ninth Circuit noted in *Craighead* that "the presence of a large number of visibly armed law
21 enforcement officers goes a long way towards making the suspect's home a police-
22 dominated atmosphere," and cited cases involving eight, seven, and five officers. *See* 539
23 F.3d at 1085. The number of officers in this case contributed to such an atmosphere.

24    Second, although Defendant Salabye was not restrained by force, threats, or
25 handcuffs, he testified credibly that Agent Fant directed him to exit the residence when the
26 officers first arrived and directed him to the truck after the search warrant had been read. For
27 more than two hours Agent Fant questioned Defendant in the closed confines of the truck.
28 Throughout this period, Agent Fant was in full uniform with a firearm, one of the Navajo

officers was visible a short distance in front of the truck, and other armed agents were searching Defendant's home. The Court concludes that such an environment amounted to law enforcement containment and control of Defendant. The Ninth Circuit has previously held, in a case cited favorably in *Craighead*, that an interrogation was custodial when a suspect "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house." *United States v. Lee*, 690 F.2d 466, 468 (9th Cir. 1982). Defendant Salabye was in a similar position. Moreover, it is relevant that Agent Fant, although calm and courteous, was clearly in control of the situation. He confronted the two women when they arrived at the house and directed them not to return, he directed Ms. Begay to surrender her purse, and he directed Defendant not to answer the telephone during the in-house questioning.

The third factor identified in *Craighead* is whether Defendant Salabye was isolated from others. Defendant Salabye was not initially questioned in his home, but was directed to Agent Fant's truck. During at least the first hour of that questioning he was alone with Agent Fant. Ms. Begay was later present for about 25 minutes of the truck questioning, and at one point retrieved a drink for Defendant, but for the majority of the questioning in the truck Defendant Salabye was alone. When he said he was uncomfortable, Agent Fant reassured him that he was doing the right thing and that the questioning – which ultimately lasted more than two and one-half hours – would last only a "little while." Although Defendant was not as isolated as the suspect in *Craighead*, neither can it be said that he was given unfettered access to his family and others.

Fourth, although Defendant Salabye was twice told that he was free to leave, the Ninth Circuit made clear in *Craighead* that "[t]he mere recitation of the statement that the suspect is free to leave or terminate the interview . . . does not render an interrogation non-custodial *per se*." 539 F.3d at 2088. The Court of Appeals then cited *Lee* and noted that "because the suspect [in *Lee*] was questioned in a closed FBI car for over an hour while police investigators searched the house," the interrogation "was custodial even though the interrogating FBI agents told the suspect that he was free to leave or terminate the interview

at any time." *Id*. Defendant Salabye was questioned in the FWS truck for more than two hours while law enforcement investigators searched his house. If the "you are free to leave" statement did not render the interrogation in *Lee* non-custodial, neither did it in this case.

Fifth, Agent Fant questioned Defendant for two hours and 37 minutes. As the Ninth Circuit notes in *Kim*, this was "a full-fledged interrogation, not a brief inquiry." *Kim*, 292 F.3d at 977 (suspect detained for "some time" before questioning began, then for at least 30 minutes before an interpreter arrived and for another 20 minutes with the interpreter). If the questioning in this case had been limited to the 30 minutes in Defendant's house, where he was sitting by his common law wife in a relatively non-confined space, this would be a different case. But two hours and seven minutes of interrogation in the cab of a pickup truck by a uniformed and armed law enforcement agent, with a uniformed Navajo officer clearly visible through the windshield and three other law enforcement officers on the premises, weighs heavily in favor of this being a custodial interrogation.

Sixth, Agent Fant confronted Defendant with evidence of his crime during the questioning. The Ninth Circuit found similar tactics to be relevant in *Lee*, where "[t]he agents allowed him to repeat his exculpatory story, then for 15 minutes confronted him with evidence of his guilt, and told him it was time to tell the truth, but did not advise him of his rights." 699 F.2d at 468. In this case, Agent Fant confronted Defendant with evidence of his guilt, but did not advise him of his rights.

Finally, it is relevant that Defendant was at his home when this questioning occurred. As he testified, he was not comfortable leaving because it was his home, where he, Ms. Begay, and their three children lived, and it was being searched by law enforcement officers. As the Ninth Circuit noted in *Craighead*, "[i]f a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be 'free' to leave is a hollow right if the one place the suspect cannot go is his own home." 539 F.3d at 1083.

Considering the totality of the circumstances and the direction provided by the Ninth Circuit in *Craighead*, *Kim*, and *Lee*, the Court concludes that Defendant's interrogation was custodial. A reasonable person in Defendant's position would not have felt free to leave or terminate the questioning. Because Defendant was not given a *Miranda* warning, his constitutional rights were violated and his statements to Agent Fant must be suppressed.

**IT IS ORDERED** that Defendant's Motion to Suppress Statements (Dkt. #19) is **granted**.

Excludable delay pursuant to 18 U.S.C. § 3161(h)(8)(A) is found to commence on March 20, 2009 for a total of 26 days.

DATED this 15th day of April, 2009.

_David G. Campbell_
David G. Campbell
United States District Judge